UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| JANET HARRISON, | ) |
| Plaintiff, | ) Case No. SACV 04-0851 AJW |
| v. | ) MEMORANDUM OF DECISION |
| JO ANNE B. BARNHART, Commissioner of the Social Security Administration, | ) |
| Defendant. | ) |

Plaintiff filed this action seeking reversal of the decision of defendant, the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's applications disability insurance benefits. The parties have filed a Joint Stipulation ("JS") setting forth their contentions with respect to each disputed issue.

### Administrative Proceedings

The parties are familiar with the procedural facts, which are undisputed and are summarized in the Joint Stipulation. [See JS 2]. In a written hearing decision dated February 10, 2004, Administrative Law Judge Charles E. Stevenson (the "ALJ") found that plaintiff had a combination of severe impairments consisting of a history of hepatitis C, mild neck degeneration, status post left shoulder decompression, and mild depression. [AR 19]. The ALJ found that plaintiff's retained the residual functional capacity ("RFC") for a restricted range of

light work, and that her RFC did not preclude her from performing a significant number of jobs available in the national economy. [AR 19-20].

## Standard of Review

The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial evidence or if it is based on the application of incorrect legal standards. Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002); Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001). Substantial evidence is more than a mere scintilla but less than a preponderance. Richardson v. Perales, 402 U.S. 389, 401 (1971); Thomas, 278 F.3d at 954. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401 (quoting Consolidated Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938)); Thomas, 278 F.3d at 954. The court is required to review the record as a whole, and to consider evidence detracting from the decision as well as evidence supporting the decision. Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas, 278 F.3d at 954 (citing Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir.1999)).

## Discussion

Plaintiff contends that the ALJ committed legal error because he failed to discuss the opinion of plaintiff's treating physician, Greg Maddex, D.O., that plaintiff would not be able to maintain regular job attendance, and because the ALJ disregarded consistent testimony from the non-examining medical expert, Arnold Ostrow, M.D.

In a written functional assessment dated December 24, 2003, Dr. Maddex opined that plaintiff could perform what amounts to less than sedentary work, and he said that plaintiff's impairments would cause her to be absent from work more than three times a month. [AR 298-300]. Asked to state the medical findings that supported the assessed limitations, Dr. Maddex cited "severe cervical, thoracic and [lumbar spine] spasm lasting several days after moderate

activity." [AR 299].[1]

Dr. Maddex also signed a disability opinion letter addressed to the ALJ that was stamped received by plaintiff's lawyer on January 13, 2004 and was submitted as an exhibit during the administrative hearing on that date. [See AR 39, 309]. In that letter, Dr. Maddex said that plaintiff had been under his care since 1998.[2] He opined that plaintiff was unable to maintain gainful employment due to pain and other symptoms associated with diagnoses of fibromyalgia, Chronic Fatigue Immune Dysfunction Syndrome, chronic hepatitis C, and lumbar degenerative disk disease. [AR 309]. Dr. Maddex concluded that "there is no reason to expect significant future improvement based on current medical knowledge," and he characterized plaintiff's current treatment as "purely palliative" and "supportive" in nature. [AR 309]. As objective findings supporting his opinion, Dr. Maddex cited a liver biopsy showing chronic hepatitis C, a December 2003 MRI showing degenerative disk disease, "laboratory analysis" showing "adrenal and thyroid insufficiency and deficiency," and "multiple, widespread exquisitely tender trigger points consistent with fibromyalgia, obviously painful gait and bodily movements, multiple joint pain and swelling." [AR 309].

Dr. Ostrow testified as a medical expert during the administrative hearing. [See AR 45-53]. He disputed the diagnoses in the record of fibromyalgia and chronic fatigue syndrome ("CFS"). He said that the record did not document the recurrent episodes of lymphadenopathy, pharyngitis, fever, and fatigue characterizing CFS or the chronically elevated Epstein-Barr

---

[1] The assessment form also contains references to a January 12, 2004 MRI report purportedly showing "2 ruptured and 2 bulging disks in the cervical spine" causing "irritation that radiates pain and numbness in arms and hand." [AR 298, 300]. No MRI report dated January 12, 2004 is included in the record. Furthermore, that notation must have been written <u>after</u> Dr. Maddex signed the form on December 24, 2003. It is one of several notations on the assessment form written in handwriting that is distinctly different from that of Dr. Maddex, whose handwritten notes appear on numerous treatment reports included elsewhere in the record. [Compare AR 298-300 with AR 200, 204-205, 207, 210, 212, 217, 220-222].

[2] The record contains treatment records from Dr. Maddex for the period January 2000 through December 2003. [See AR 155-166, 200-226, 284-295].

1  serologies that may be associated with it. [AR 46-47].  Dr. Ostrow testified that fibromyalgia
2  is an illness diagnosed "in the absence of well documented, functional impairment or autonomic
3  impairment that you can demonstrate. [Plaintiff has] demonstrable cervical disk degenerative
4  disease, causing a lot of her neck and shoulder pain, and back pain.... There is no place in the
5  record where the tender points were listed in or controls demonstrated." [AR 47-48].   Dr.
6  Ostrow noted that plaintiff had been prescribed "multiple medications for all sorts of things....
7  And she's taking multiple medications, multiple narcotic medications for pain.  And in
8  particular MS Contin....  So, it's very difficult to say what was given for what." [AR 47].

9  Dr. Ostrow opined that considering both her documented impairments and the
10 medications plaintiff was taking, she would be limited to a restricted range of light work. [AR
11 49].  In response to questions by plaintiff's attorney, Dr. Ostrow testified that, "judging from
12 the records and the documentation that's available, and the fact that she's taking the narcotics
13 that she's taking," plaintiff's need for breaks during the workday would be "unpredictable," and
14 "it would be highly unlikely that her attendance would be ... regular or planned upon." [AR 50-
15 51].

16 Although not binding on the Commissioner with respect to the existence of an
17 impairment or the ultimate issue of disability, a treating physician's opinion is "is generally
18 afforded the greatest weight in disability cases." Tonapetyan v. Halter, 242 F.3d 1144, 1148
19 (9th Cir. 2001).  Where the opinion of a treating or examining physician is uncontroverted, the
20 ALJ must provide clear and convincing reasons, supported by substantial evidence in the record,
21 for rejecting it. If contradicted by that of another doctor, a treating or examining source opinion
22 may be rejected for specific and legitimate reasons that are based on substantial evidence in the
23 record. Tonapetyan, 242 F.3d at 1148-1149; Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir.
24 1995).  Standing alone, the contrary opinion of a non-examining medical expert does not
25 constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion,
26 but it may constitute substantial evidence when it is consistent with other independent
27 evidence in the record. Tonapetyan, 242 F.3d 1148.

28 The ALJ articulated several reasons for rejecting Dr. Maddex's opinion, and plaintiff does

not challenge any of those reasons or contend that they were insufficient. She contends that the ALJ improperly failed to discuss the opinions of Dr. Maddex and Dr. Ostrow regarding plaintiff's attendance.

That argument is unpersuasive. When the ALJ rejected Dr. Maddex's controverted disability opinion, he rejected the functional limitations Dr. Maddex imposed, including the attendance limitation. [See AR 15-16]. The ALJ articulated specific and legitimate reasons based on substantial evidence for rejecting Dr. Maddex's opinion. The ALJ also provided specific and legitimate reasons for his assessment of Dr. Ostrow's testimony about plaintiff's ability to maintain attendance.

The ALJ began by observing that "there is no documentation in the file of any 'exquisitely tender trigger points' or 'obviously painful gait and bodily movements.'" [AR 15]. Dr. Maddex's treatment reports contain few examination findings of tender points or trigger points [see AR 202, 203, 219], and there is no examination report from him documenting the requisite number of tender points used as diagnostic criteria for fibromyalgia. See Rollins v. Massanari, 261 F.3d 853, 855 (9th Cir. 2001) (explaining that fibromyalgia's cause or causes are unknown, its symptoms are entirely subjective, and "'the only symptom that discriminates between it and other diseases of a rheumatic character' multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch")(quoting Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996)).[3] In addition, the

---

[3] The diagnostic criteria for fibromyalgia identified by the American College of Rheumatology are (1) at least three months of chronic widespread muscular pain both above and below the diaphragm and on both sides of the body, and (2) painful tender points at no less than 11 of 18 characteristic locations on the body. These tender points "cause pain only under the place where pressure is applied, whereas 'trigger points' seen with other disorders usually produce referred or radiating pain that causes a sharp withdrawal reaction." Dan J. Tennenhouse, M.D., J.D., F.C.L.M., Attorneys' Medical Deskbook 3d § 20:6.2 (2004).

December 2003 assessment form signed by Dr. Maddex contains no reference to the tender points, painful gait or bodily movements, or multiple joint swelling that Dr. Maddex cited as a basis for his disability opinion a month later. [See AR 298-300]. See Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003) (holding that the ALJ properly found that the contradicted opinion of a treating physician regarding the claimant's limitations were not supported by his own treatment notes).

The ALJ also pointed to the report of a consultative internal medicine examination conducted by Danny Lee, M.D., just six months before the date of Dr. Maddex's letter. During that examination, plaintiff exhibited only "a few tender points" along with "multiple control point tenderness," which "would actually negate a diagnosis of fibromyalgia." [AR 15; see AR 196]. Contrary to Dr. Maddex's unsupported assertions, Dr. Lee found that plaintiff had a normal gait, no focal neurological or motor deficits, no joint swelling, grossly normal range of motion except for a slight limitation in the neck, no muscle spasms, and no radiculopathy. [See AR 193-198]. Dr. Lee opined that plaintiff could perform light work, subject only to the need to avoid moving machinery and unprotected heights. [AR 15].

The ALJ highlighted additional inconsistencies between Dr. Maddex's opinion regarding plaintiff's pain complaints and the objective findings. In his January 2004 letter, Dr. Maddex said that plaintiff suffered from "severe intractable pain" in part from stenosis[4] of the L5-S1 vertebrae, but the ALJ noted that plaintiff's December 2003 MRI report contradicted that assessment. [AR 15]. Concerning the L5-S1 level, that MRI disclosed "mild degenerative disc disease" with "no significant central canal stenosis. There is mild foraminal[5] stenosis on the left

---

[4] Spinal stenosis is an abnormal narrowing of the central spinal canal. 4 J. E. Schmidt Attorneys' Dictionary of Medicine S-292 (1996).

[5] A foramen is an "aperture or perforation through a bone or a membranous structure." Intervertebral foramina are "openings into the vertebral canal bounded by the pedicles of adjacent vertebrae above and below, the vertebral body (mostly of the superior vertebra) and intervertebral disk anteriorly, and the articular processes forming the zygapophysial joint posteriorly." Stedman's Medical Dictionary foramen, foramina

but not the right." [AR 306-307]. Similarly, the ALJ pointed out that Dr. Maddex's December 2003 assessment indicates that plaintiff had upper extremity limitations due in part to cervical radiculopathy,[6] but the December 2003 cervical MRI showed only mild degenerative disc disease with slight foraminal narrowing on the left but not the right. [See AR 302-303]. In addition, the ALJ remarked that there were no radicular signs or symptoms and no motor or sensory deficits documented in the record. [AR 16, 304].

Given the weaknesses and inconsistencies within and between Dr. Maddex's assessments, the ALJ permissibly credited the contrary opinion of Dr. Ostrow, whose functional assessment actually was somewhat more restrictive than those of the consultative examiner, Dr. Lee, the nonexamining state agency physicians, or plaintiff's treating orthopedist, Dr. Wrobel. [AR 16; see AR 167-169, 193-198, 262-269]. The ALJ acknowledged that Dr. Ostrow opined that the medications plaintiff was taking alone could disable her. [AR 16, 51]. Dr. Ostrow, however, qualified that testimony by adding that he thought that plaintiff's underlying impairment "does not warrant the degree of medication she takes that renders her functionally impaired." [AR 16, 52]. The ALJ cited that testimony, and he also pointed to other evidence in the record suggesting that plaintiff actively sought particular narcotic medication from her doctors, and that some of her requests were granted without adequate justification or explanation in the record.

On March 21, 2000, for example, plaintiff visited a hospital emergency room seeking a pain medication injection for facial pain due to herpes zoster infection (shingles). According to the emergency room report, plaintiff said that earlier the same day she had seen her primary

---

(27th ed. 2000).

[6] Cervical radiculopathy refers to cervical spine nerve root irritation caused by a bulging or herniated disc abutting the spinal cord or its nerves as they exit the bony spinal column. See Stedman's Medical Dictionary radiculopathy (27th ed. 2000);http://www.medicinenet.com/degenerative_disc/page2.htm (last visited December 14, 2005). For the reasons explained in note 1, supra, the notations on the assessment form about radicular symptoms do not appear to have been written by Dr. Maddex, but nevertheless the ALJ assumed that they were.

care physician, Dr. Maddex, who told plaintiff "that he was not able to prescribe any additional pain medications" but who instructed her to take a taxi to the emergency room for "pain medication injection." [AR 228]. Plaintiff rated her pain as 10 out of 10, but she appeared to be in only "minor to moderate distress secondary to facial pain." [AR 229]. Told that it was against hospital policy to administer medication and send the patient home unaccompanied in a taxi, plaintiff "became agitated" and, despite being asked to wait a few minutes until the attending physician could see her, left the hospital against medical advice. [AR 228-229]. An entry in Dr. Maddex's treatment reports dated March 21, 2000 states that plaintiff reported having gone to the emergency room for complaints of maxillofacial pain and left when she could not get anyone to pick her up. [AR 221]. There is no mention of plaintiff's having contacted Dr. Maddex before going to the emergency room or of his having instructed her to seek an emergency pain medication injection.

Treating notes from Jay Goldstein, M.D., for the period August 2000 to November 2002 also raise questions about the basis for some of plaintiff's prescription medication and indicate that plaintiff not infrequently took the initiative in requesting particular medications. Those reports also show that multiple and overlapping prescriptions for narcotic pain medications were issued without much documentation of the clinical indications for their usage, and that plaintiff sometimes used her prescriptions inappropriately. [See, e.g., AR 254 (August 17, 2000 - plaintiff called stating she used Stadol nasal spray[7] twice a day and only had enough left for 14 sprays, and that "in the past she tried Methadone with good results. Dr. Goldstein was informed & stated that he would [prescribe] Methadone instead of Stadol because 'it lasts longer.'"); AR 254 (August 24, 2000 - plaintiff reported that she "took Stadol [nasal spray] at 9:30 a.m. for root canal & took 800 milligrams of Motrin which didn't work & then an

---

[7] Stadol nasal spray, generically known as butorphanol tartrate nasal spray, is a strong narcotic analgesic for treatment of pain and migraine headaches. See http://www.medicinenet.com/butorphanol_tartrate-nasal/article.htm (last visited December 14, 2005).

injection of Toradol.[8] She is warned of the risk of GI bleed [with] this practice." Nonetheless, plaintiff that same day was prescribed methadone 10 milligrams (which can cause withdrawal symptoms if used with butorphanol, an active ingredient in Stadol nasal spray)[9]; AR 253 (October 2000 - prescription issued for methadone 10 milligrams TID (three times a day) # 100 without record of office visit since August 2000); AR 252 (December 22, 2000, April 4, 2001 (prescriptions issued for methadone 10 milligrams TID #100 without record of office visit since August 2000, but April 4, 2001 prescription expired); AR 250 (April 10, 2001 - plaintiff reports improvement on methadone; prescriptions written include Oxycontin 20 milligrams BID[10]); AR 249 (April 23-24, 2001 - plaintiff is not seen but picks up a prescription

---

[8]  Toradol is "a nonsteroidal anti-inflammatory drug (NSAID), is indicated for the short-term (up to 5 days in adults) management of moderately severe acute pain that requires analgesia at the opioid level. It is NOT indicated for minor or chronic painful conditions. TORADOL is a potent NSAID analgesic, and its administration carries many risks. The resulting NSAID-related adverse events can be serious in certain patients for whom TORADOL is indicated, especially when the drug is used inappropriately." Physicians' Desk Reference Toradol (Thomson PDR 2000).

[9]  Methadone "is a synthetic narcotic.... Withdrawal symptoms may also be caused by using certain narcotics (partial agonist/antagonists such as ... butorphanol ...) after using methadone.... [Methadone] is used for severe pain. It is also used in the treatment of narcotic addiction as part of an approved program." http://www.medicinenet.com/methadone-oral_tablet/article.htm (last visited December 14, 2005).

[10]  Oxycontin (a brand name for oxycodone hyrochloride) is a narcotic analgesic qualitatively similar to morphine. It is indicated for the management of moderate to severe pain when a round-the-clock analgesic is needed for an extended period, and it is not intended to be used on an "as needed" basis. Its therapeutics effects include analgesia, sedation, euphoria, and feelings of relaxation. Oxycodone "can produce drug dependence of the morphine type, and therefore, has the potential for being abused. Psychic dependence, physical dependence and tolerance may develop upon repeated administration of this drug, and it should be prescribed and administered with the same degree of caution appropriate to the use of other oral narcotic-containing medications." Physicians' Desk Reference Oxycontin, Oxyir (Thomson PDR 2000).

for methadone 10 milligrams # 100.  The following day, having told Dr. Goldstein by phone that she is having shoulder surgery and is worried about post-operative pain, plaintiff picks up prescriptions for Duragesic [11] 50 milligram patch and MS Contin.[12]  Her surgical discharge report from Dr. Wrobel dated April 27, 2001 also indicates that she was prescribed a fentanyl patch (the generic equivalent of Duragesic). [AR 126]); AR 249 (May 30, 2001 - plaintiff not seen; prescription for Oxycontin 20 milligrams BID (twice a day) #60 mailed to pharmacy); AR 248 (August 8, 2001 plaintiff asks for increased dose of Klonopin, an anti-seizure drug, explaining that it is "working great for pain"; Dr. Goldstein agrees); AR 248 (November 20, 2001 - plaintiff calls office requesting "fast acting pain reliever narcotic - Stadol not working"; Dr. Goldstein advised her to schedule an appointment; on November 26, 2001, Nubain[13] nasal spray is given); AR 242 (March 26, 2002- plaintiff reports being fired from her job for poor performance and is "going on state disability"; wants to try MS Contin; is prescribed multiple medications including MS Contin and Oxycontin for "breakthrough pain";) AR 241 (April 1-9, 2002 - prescriptions issued on two days for MS Contin 30 milligrams BID #30 and Oxycontin IR (immediate release) 5 milligrams Q4H (every four hours) #100 PRN (as needed for) breakthrough pain and Oxycontin 20 milligram BID #100; plaintiff picks up the second set of

---

[11] Duragesic is a "transdermal system providing continuous systemic delivery of fentanyl, a potent opioid analgesic, for 72 hours" and "is indicated for treatment of chronic pain (such as that of malignancy) that: 1. Cannot be managed by lesser means such as acetaminophen-opioid combinations, non-steroidal analgesics, or PRN dosing with short-acting opioids and 2. Requires continuous opioid administration." Physicians' Desk Reference Duragesic (Thomson PDR 2000).

[12] MS Contin is a narcotic , oral morphine formulation "indicated for the relief of moderate to severe pain. It is intended for use in patients who require repeated dosing with potent opioid analgesics over periods of more than a few days." Physicians' Desk Reference MS Contin (Thomson PDR 2000).

[13] Like Stadol, Nubain is a narcotic opioid analgesic. Physicians' Desk Reference Nubain(Thomson PDR 2000).

prescriptions from the office, claiming that she did not receive the first set of medications delivered from her pharmacy via Fed Ex, but "Fed-Ex claims they delivered it on Friday 4/5/02 around 10:30 a.m."; AR 240 (May 13 & May 20, 2002 (prescriptions for MS Contin 20 milligrams BID #60 and Oxycontin IR 5 milligrams #100 Q4H PRN breakthrough pain issued); AR 233 (November 2002 - plaintiff requesting Duragesic patch; "insurance company has denied her prescription for Adderall[14] because it is not FDA approved for CFS"); AR 236 (July 15, 2002 - plaintiff was not seen; however, a prescription was faxed to her pharmacy for Oxycontin IR 5 milligrams #100; the following day, a prescription of Avinza 60 milligrams #100[15] is issued, but plaintiff cannot afford the purchase); AR 236 (July 30, 2002 - plaintiff "wishes to try Duragesic patches as she had last April.  Will refill 50 mcg #15."); AR 238 (plaintiff "would like to try 24 hour [MS Contin]... She wants to try injections in to [illegible] and assoc[iated] areas.  These were administered.")].

In April 2002, plaintiff saw her treating orthopedic surgeon, Dr. Wrobel, for complaints of left shoulder pain. [AR 169].  Dr. Wrobel had performed the surgical decompression of her left shoulder a year earlier. [AR 169; see AR 170-185].  Dr. Wrobel noted that he had last seen plaintiff in July 2001, about nine months earlier, and that she had missed three intervening scheduled appointments. [AR 169].  Plaintiff told Dr. Wrobel that she believed she had been injured during the physical therapy he had prescribed, and she "was questioning whether or not she should sue the therapist but apparently now is applying for disability." [AR 169].  Plaintiff also told Dr. Wrobel she had been "fired from her job so she is doing professional [personal]

---

[14] Adderall is an amphetamine indicated for treatment of attention deficit hyperactivity disorder.  Due to its "high potential for abuse," amphetamines "should be prescribed or dispensed sparingly." Physicians' Desk Reference Adderall (Thomson PDR 2000).

[15] Avinza is a brand name for morphine sulfate extended-release capsules and "is indicated for the relief of moderate to severe pain requiring continuous, around-the-clock opioid therapy for an extended period of time." Physicians' Desk Reference Avinza (Thomson PDR 2000).

training at home." [AR 169]. She said she that in the future she hoped to teach training only due to her fibromyalgia. Plaintiff reported that "her left shoulder is somewhat symptomatic ," and she asked for a steroid injection. [AR 169]. Dr. Wrobel noted that "[i]t must be mentioned that she said she is taking quite a bit of medication because her shoulder was hurting." [AR 169].  According to the record, plaintiff was then taking a number of other medications prescribed by Dr. Goldstein and had received prescriptions for narcotic pain medication (MS Contin and Oxycontin) from him two weeks earlier. [AR 241-242]. On examination by Dr. Wrobel, plaintiff's left shoulder had "full rhythmic range of motion" with "perhaps slight winging of her scapula," "strong rotator cuff testing," "slightly positive Hawkins and Neer tests,"[16] and an otherwise negative examination. [AR 169]. Dr. Wrobel administered the steroid injection, but two months later he completed an assessment form indicating that plaintiff could do a restricted range of light work, and that the prognosis for her shoulder was good. [AR 167-168].

The ALJ provided specific and legitimate reasons based on substantial evidence for rejecting the opinion of Dr. Maddex. In addition, he permissibly relied on Dr. Ostrow's testimony that plaintiff's medical impairments did not warrant her heavy use of narcotic medication, and he cited substantial evidence in the record that buttressed Dr. Ostrow's opinion in that regard.[17]

---

[16] A positive "impingement sign," also called the "Hawkins test," is significant for shoulder impingement syndrome or rotator cuff tendonitis. A positive Neer's sign is significant for subacromial impingement of the rotator cuff tendons in the shoulder. Dan J. Tennenhouse, M.D., J.D., F.C.L.M., Attorneys' Medical Deskbook 3d § 11:2 (2004).

[17] The ALJ did not mention the medications log that plaintiff submitted as an exhibit during the hearing [AR 39, 311], and it is not clear whether Dr. Ostrow had the opportunity to review that document before he testified, but that log indicates that plaintiff was not taking any prescription (or even nonprescription) pain relievers at the time of the hearing. The medications listed include two anti-depressants (Wellbutrin and Doxepin), an estrogen patch, an expectorant/decongestant, Singulair (used for the prophylactic treatment of asthma and seasonal allergic rhinitis), clindamycin for a skin infection, and phenergan suppositories as needed for nausea. [AR 311].

**Conclusion**

For the reasons stated above, the Commissioner's decision is supported by substantial evidence and reflects application of the proper legal standards. Accordingly, defendant's decision is **affirmed.**

**IT IS SO ORDERED.**

DATED: December 19, 2005

                                         /s/
                               ANDREW J. WISTRICH
                               United States Magistrate Judge